CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave. N.W.
Washington, D.C. 20530
Telephone: (202) 616-8475
Facsimile:   (202) 616-8470
Email:  kathryn.wyer@usdoj.gov

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PIHMA Health & Education Network LLC, *et al*., <br><br> Plaintiffs, <br><br> vs. <br><br> Betsy DeVos, <br><br> Defendant. | NO. CV-17-00538-PHX-ROS <br><br> **DEFENDANT'S COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Defendant respectfully moves for summary judgment on all of Plaintiffs' claims pursuant to Fed. R. Civ. P. 56, as there is no genuine issue of material fact precluding judgment in Defendant's favor, and Defendant is entitled to judgment as a matter of law. A memorandum of law in support of Defendant's cross-motion  and in opposition to Plaintiffs' motion for summary judgment[1]  appears immediately below and as part of this motion. A statement of material facts as to which there is no genuine issue is filed herewith.

---

[1] Defendant notes that Plaintiffs have not filed a motion for summary judgment. However, they have filed a memorandum in support of such a motion. *See* ECF No. 50.

1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 1

    I.     Title IV of the Higher Education Act's Gainful Employment
          Requirement ................................................................................................ 1

    II.    The Department's Gainful Employment Regulations ................................. 2

    III.   Procedural History ...................................................................................... 5

STANDARD OF REVIEW ................................................................................................. 6

ARGUMENT ...................................................................................................................... 7

    I.     THE 2014 FINAL RULE IS NOT ARBITRARY OR CAPRICIOUS ON
          THE BASES ALLEGED BY PLAINTIFFS ................................................. 7

          A.    The Department Reasonably Responded to Comments Proposing
                that Graduate Medical Programs Be Exempted From the GE
                Regulations ...................................................................................... 9

          B.    The Department Reasonably Responded to Comments Proposing
                that Earnings Be Measured Five or More Years After
                Graduation ..................................................................................... 12

          C.    The Department Reasonably Responded to Comments Proposing
                Alternative Metrics ........................................................................ 13

          D.    Plaintiffs Fail to Identify a Viable or Obvious Alternative that the
                Department Ignored ....................................................................... 14

CONCLUSION ................................................................................................................. 17

ii

1

## TABLE OF AUTHORITIES

2

**Cases**

3

4

*Altera Corp. & Subsidiaries v. Comm'r,*
      No. 16-70496, 2018 WL 3542989 (9th Cir. July 24, 2018) ................................ 7, 8

5

6

*Am. Ass'n of Cosmetology Schools ("AACS") v. DeVos,*
      258 F. Supp. 3d 50 (D.D.C. 2017) ........................................................................ 5

7

*Am. Civil Liberties Union ("ACLU") v. FCC,* 823 F.2d 1554 (D.C. Cir. 1987) ............. 11

8

9

*Am. Great Lakes Ports Ass'n v. Zukunft,* 296 F. Supp. 3d 27 (D.D.C. 2017) ................. 17

10

*Am. Mining Congress v. EPA,* 965 F.2d 759 (9th Cir. 1992) ............................................. 8

11

12

*Ass'n of Private Colls. & Univs. v. Duncan ("APSCU I"),*
      870 F. Supp. 2d 133 (D.D.C. 2012) ................................................................. 2, 13

13

14

*Ass'n of Private Sector Colls. & Univs. v. Duncan ("APSCU II"),*
      681 F.3d 427 (D.C. Cir. 2012) ............................................................................. 2

15

16

17

*Ass'n of Private Sector Colls. & Univs. v. Duncan ("APSCU III"),*
      110 F. Supp. 3d 176 (D.D.C. 2015), *aff'd,* No. 15-5190, 640 Fed. Appx. 5
      (D.C. Cir. Mar. 8, 2016) ("*APSCU IV*") (unpublished) ................................ 1, 2, 12

18

19

*Ass'n of Private Sector Colls. & Univs. v. Duncan ("APSCU IV"),*
      No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8, 2016) (unpublished) ........... 1, 8

20

*Ass'n of Proprietary Colls. v. Duncan ("APC"),*
      107 F. Supp. 3d 332 (S.D.N.Y. 2015) .......................................................... 1, 2, 12

21

22

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke,*
      889 F.3d 584 (9th Cir. 2018) ............................................................................. 16

23

24

*Califano v. Sanders,* 430 U.S. 99 (1977) .......................................................................... 6

25

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971) .................... 6, 15

26

*City of Brookings Mun. Tel. Co. v. FCC,* 822 F.2d 1153 (D.C. Cir. 1987) .................. 8-9

27

28

iii

*Clark–Cowlitz Joint Operating Agency v. FERC,*
    826 F.2d 1074 (D.C. Cir. 1987) (en banc) ........................................................ 16

*Crosby Lodge, Inc. v. Nat'l Indian Gaming Comm'n,*
    No. 06-cv-657, 2008 WL 5111036 (D. Nev. Dec. 3, 2008) ................................... 7

*Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 266 F. Supp. 2d 1101 (N.D. Cal. 2003) ......... 7

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) ..................... 15, 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................... 8

*Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1229 (9th Cir. 1993) ..................................... 16

*Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845 (9th Cir. 2017) ........................................... 6

*Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200 (D.C. Cir. 2013) .............. 8, 16

*Occidental Eng'g Co. v. INS*, 753 F.2d 766 (9th Cir. 1985) ........................................... 6

*Perez v. Mtg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) ................................................... 7

*Star Wireless, LLC v. FCC*, 522 F.3d 469, 475 (D.C. Cir. 2008) .................................. 17

*US Citrus Science Council v. U.S. Dep't of Agric.,*
    No. 117-cv-680, 2018 WL 1071152 (E.D. Cal. Feb. 27, 2018) ............................ 6

*Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 885 F.3d 714 (D.C. Cir. 2018) ............ 8

*WildEarth Guardians v. Provencio*, 272 F. Supp. 3d 1136 (D. Ariz. 2017) ..................... 6

*Yazzie v. U.S. Envtl. Prot. Agency*, 851 F.3d 960 (9th Cir. 2017) ................................... 6

**Statutes**

5 U.S.C. § 553 ................................................................................................................ 7

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 704, 706 ......................................... 6

Higher Education Act, Title IV, 20 U.S.C. §§ 1070 *et seq.* ............................................. 1

iv

20 U.S.C. § 1002 ................................................................................................ 1, 2

20 U.S.C. § 1088 ................................................................................................ 1, 2

**<u>Administrative Materials</u>**

76 Fed. Reg. 34386 (2011) (Final regulations) ........................................... 11, 15

79 Fed. Reg. 16426 (Mar. 25, 2014) (Notice of Proposed Rulemaking) ("NPRM") ... 2, 11

79 Fed. Reg. 64890 (Oct. 31, 2014) (Final regulations) ("2014 Final Rule") ..........*passim*

82 Fed. Reg. 27640 (June 16, 2017) .............................................................. 17

82 Fed. Reg. 39362 (Aug. 18, 2017) ................................................................ 5

83 Fed. Reg. 28177 (June 18, 2018) ................................................................ 5

34 C.F.R. § 668.403 ......................................................................................... 3, 4

34 C.F.R. § 668.404 ......................................................................................... 2, 4

34 C.F.R. § 668.405 ............................................................................................ 4

34 C.F.R. § 668.406 ......................................................................................... 4, 5

34 C.F.R. § 668.410 ............................................................................................ 5

**INTRODUCTION**

In this case, Plaintiffs—a group of schools with graduate programs in acupuncture and oriental medicine ("AOM programs")—challenge regulations promulgated in 2014 by the Department of Education ("Department"), implementing a provision in Title IV of the Higher Education Act, requiring that certain postsecondary programs—specifically, vocationally-oriented programs—"prepare students for gainful employment in a recognized occupation." *See* 20 U.S.C. §§ 1002(b)(1)(A)(i), (c)(1)(A), 1088(b)(1)(A)(i). Under those Gainful Employment ("GE") regulations, which went into effect in July 2015, programs subject to the requirement must meet certain minimum debt-to-earnings ("D/E") rates in order to remain eligible for Title IV federal financial assistance. Three courts have already upheld the GE regulations against facial challenges. *See Ass'n of Private Sector Colls. & Univs. v. Duncan* ("*APSCU III*"), 110 F. Supp. 3d 176 (D.D.C. 2015), *aff'd*, No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8, 2016) ("*APSCU IV*") (unpublished); *Ass'n of Proprietary Colls. v. Duncan* ("*APC*"), 107 F. Supp. 3d 332 (S.D.N.Y. 2015).

In seeking to raise an "as applied" challenge with respect to AOM programs, Plaintiffs argue that the Department did not respond to their significant comments during the rulemaking process, and that the Department's Final Rule is arbitrary as a result because it did not grant AOM programs any specific exemption or accommodation. However, the Administrative Record conclusively demonstrates that, in fact, Plaintiffs never suggested an exemption specific to AOM programs; to the contrary, their comments focused on graduate medical programs in general. Because the Department reasonably addressed the comments that it received, it is entitled to judgment as a matter of law, and Plaintiffs' motion for summary judgment should be denied.

**BACKGROUND**

**I.      Title IV of the Higher Education Act's Gainful Employment Requirement**

The HEA's Title IV, 20 U.S.C. §§ 1070 *et seq.,* authorizes the Department to enter into agreements with postsecondary schools that allow students at those schools to receive

1

federal loans. While the schools benefit when students use loan money to pay their tuition, the United States government guarantees the loans, and if students fail to repay their loan debt, the Department (and thus the taxpayer) is ultimately responsible for paying off defaulted student loans with federal funds. *See APSCU v. Duncan* ("*APSCU II*"), 681 F.3d 427, 433 (D.C. Cir. 2012).

The HEA provides loan eligibility not only for students earning traditional degrees at traditional colleges and universities, but also for students at for-profit trade and vocational schools. *See* 20 U.S.C. §§ 1002(a), 1088(b). Students enrolled in a program at the latter category of schools are eligible for Title IV funding if the program "prepare[s] [its] students for gainful employment in a recognized occupation." *Id.* §§ 1002(b)(1)(A)(i), (c)(1)(A), 1088(b)(1)(A)(i)).

Courts have repeatedly recognized that "[t]here is no unambiguous meaning of what makes employment 'gainful.'" *APC*, 107 F. Supp. 3d at 359 (quoting *APSCU v. Duncan* ("*APSCU I*"), 870 F. Supp. 2d 133, 146 (D.D.C. 2012)); *accord APSCU III*, 110 F. Supp. 3d at 186. By declining to define such terms in the HEA, Congress therefore "le[ft] a policy gap, which it is the Department's prerogative to fill." *Id.*

## II.  The Department's Gainful Employment Regulations

The Department issued the Gainful Employment ("GE") regulations at issue here in 2014 with an effective date of July 1, 2015. *See generally* 79 Fed. Reg. 16426 (Mar. 25, 2014) (Notice of Proposed Rulemaking) ("NPRM"); 79 Fed. Reg. 64890 (Oct. 31, 2014) (Final regulations) ("2014 Final Rule"). Programs that are subject to the gainful employment requirement ("GE programs") provide occupational training in fields including cosmetology, business administration, medical or dental assistance, and massage therapy. *Id.* at 65025.[2]

The regulations have three goals: (1) to assess whether programs indeed prepare

---

[2] The background of the requirement has been described in detail in other judicial decisions as well as in the 2014 Final Rule. *See APSCU III*, 110 F. Supp. 3d at 191–83; *APSCU I*, 870 F. Supp. 2d at 137–40; *APC*, 107 F. Supp. 3d at 339–41; 79 Fed. Reg. at 65031–35.

students to earn enough to repay their loans, or are sufficiently low cost, such that students are not unduly burdened with debt, (2) to ensure that schools have a meaningful opportunity and reasonable time to improve their programs after the regulations take effect, and (3) to safeguard the federal investment of Title IV student aid dollars. 79 Fed. Reg. at 64891.[3] The regulations establish two debt-to-earnings ("D/E") rate measures—the discretionary income rate and the annual earnings rate—to assess whether a program prepares its students for gainful employment in a recognized occupation. 34 C.F.R. § 668.403(b). These D/E rates evaluate the amount of debt students who completed a GE program incurred to attend that program in comparison to those same students' discretionary and annual earnings after completing the program. *Id.* § 668.404. The Department calculates both rates for each GE program, and determines, based on the results, whether a GE program "passes," "fails," or is "in the zone." *Id.* § 668.403(b)–(c). A program need only pass one of the two D/E rates to satisfy the gainful employment requirements. *Id.* § 668.403(c).

Both the discretionary income rate and the annual earnings rate are calculated using the mean or median annual earnings of a program's graduates during a specified period. *Id.* § 668.404(a). This mean or median annual earnings figure is in turn calculated using data obtained from the Social Security Administration's ("SSA") Master Earnings File ("MEF"). 79 Fed. Reg. at 64950. The MEF is used to calculate Social Security benefit amounts for individuals, as well as for policy analysis and research both within and outside SSA.[4] It is populated using earnings information reported to SSA and the Internal Revenue Service on various tax forms under penalty of law. Such earnings are not limited to earnings in an occupation related to the training provided by the program. *See* 79 Fed. Reg. at 64951.

In a given year, a program passes if its graduates' average annual loan payment is

---

[3] The regulations also require schools to disclose certain information about their programs to students and prospective students. 79 Fed. Reg. at 64890. The disclosures are intended to benefit students, the public, and schools by increasing the quality and availability of information about the outcomes of those previously enrolled in GE programs.

[4] *See* SSA's Master Earnings File: Background Information, U.S. Social Security Administration, available at https://www.ssa.gov/policy/docs/ssb/v69n3/v69n3p29.html .

less than or equal to 20% of discretionary income[5] or 8% of annual earnings. 34 C.F.R. § 668.403(c)(1). A program fails if its graduates' average annual loan payment is more than 30% of discretionary income and 12% of annual earnings. *Id.* § 668.403(c)(2). A program that does not pass and has at least one D/E rate in between these figures is "in the zone." *Id.* § 668.403(c)(3). The 2014 Final Rule provides that, ultimately, a program will lose eligibility for Title IV funds if it has failing D/E rates for 2 out of 3 consecutive years, or has a combination of D/E rates that are in the zone or failing for 4 consecutive years. *Id.* § 668.403(c)(4).

Under the GE regulations, the Department must afford schools the opportunity to weigh in at several points during the D/E rate calculation process as well as afterwards. *Id.* § 668.405. First, schools may submit corrections to the Department's list of the students who completed a school's GE program during the relevant time period. *Id.* § 668.405(c). Second, the Department must also furnish schools with draft D/E rates as well as the underlying data used to calculate those rates, including mean and median annual earnings and individual student loan information, and schools then have 45 days within which to challenge the student loan debt information before the Department issues final D/E rates. *Id.* § 668.405(e)–(f).

Finally, after the expiration of this 45-day period, the GE regulations provide that the Department will transmit the calculated final D/E rates for each GE program to the school in a "notice of determination." *Id.* § 668.405(a)(6), (g). If the notice of determination shows that a GE program is in the zone or failing, the school running that program may file an "alternate earnings appeal." *Id.* §§ 668.405(7), .406(a). In order to prevail in such an appeal, the school must show that its program would achieve a better result (either passing

---

[5] The Department calculates discretionary income by subtracting (1.5xPoverty Guideline) from the higher of the mean or median annual earnings of a program's graduates within a two- or four-year cohort period. *See* 34 C.F.R. § 668.404(a)(1). 150 percent of the Poverty Guideline "is considered to be protected or reserved to enable students to meet basic living costs," for a family size of one. 79 Fed. Reg. at 64934. Thus, "[o]nly the remaining amount of annual earnings is considered to be available to make loan payments." *Id.*

4

or falling in the zone) if, rather than SSA earnings data, the Department used alternate earnings either from a survey conducted by the school or from a State-sponsored data system. *Id.* § 668.406(b)(1), (c), (d).[6]

While an appeal is pending, a school is not subject to the requirements imposed on schools that are or may become ineligible for Title IV funding in the next year. *Id.* § 668.406(e)(2) (cross-referencing requirements set forth in 34 C.F.R. § 668.410). If no appeal is submitted, or if an appeal is unsuccessful, a school with a program at risk of losing eligibility for Title IV funding based on its final D/E rates for the following year must provide warnings of the possibility of future Title IV ineligibility to students and prospective students and must refer students and prospective students to information about other similar programs. *Id.* § 668.410(a).[7]

### III. Procedural History

Plaintiffs filed their Complaint on February 21, 2017, asserting that the GE regulations are arbitrary and capricious as applied to AOM programs. Compl. ¶¶ 168–172. [ECF 1.] Defendants filed an Answer on June 19, 2017. [ECF 32.] Plaintiffs sought, and were granted, three motions to stay before the parties proposed a summary judgment briefing schedule in their proposed scheduling order. The Court issued a Scheduling Order on April 20, 2018. Pursuant to the schedule adopted in the Order, Defendant served Plaintiffs with the Administrative Record, consisting of the rulemaking record for the 2014 Final Rule, on May 4, 2018. [ECF 46.] Plaintiffs filed a Memorandum in Support of their

---

[6] On August 18, 2017, in response to another court's ruling, in *American Ass'n of Cosmetology Schools* ("*AACS*") *v. DeVos*, 258 F. Supp. 3d 50, 55, 76 (D.D.C. 2017), that the D/E rate appeals process was arbitrarily rigid in imposing numerical survey response thresholds, the Department amended the requirements for alternate earnings appeals. *See* 82 Fed. Reg. 39362, 39363 (Aug. 18, 2017). In its announcement, the Department indicated that it would not enforce the response thresholds currently set forth in § 668.406(b)(3) or (c). *See* 82 Fed. Reg. at 39363. Instead, the Department would consider the response rate along with other information when evaluating appeals on a case-by-case basis. *Id.*

[7] The Department has extended the deadline by which programs that might become ineligible for Title IV funding the following year must provide disclosures to students and prospective students by direct mail, until July 1, 2019. 83 Fed. Reg. 28177 (June 18, 2018).

Motion for Summary Judgment on May 25, 2018. [ECF 50.]

**STANDARD OF REVIEW**

Plaintiffs invoke the cause of action set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 704, 706, which authorizes a court to "set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Yazzie v. U.S. Envtl. Prot. Agency*, 851 F.3d 960, 968 (9th Cir. 2017) (internal quotation omitted). "A court may not 'substitute its judgment for that of the agency.'" *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 866 (9th Cir. 2017) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977))). Rather, a reviewing court "must uphold agency decisions so long as the agency has considered the relevant factors and articulated a rational connection between the factors found and the choices made." *WildEarth Guardians v. Provencio*, 272 F. Supp. 3d 1136, 1142–43 (D. Ariz. 2017) (alterations and internal quotation omitted).

Under the APA, a district court's review of a final agency action is limited to the administrative record. 5 U.S.C. § 706. As a result, "the usual 'genuine dispute of material fact' standard for summary judgment normally does not apply in an APA case." *US Citrus Science Council v. U.S. Dep't of Agric.*, No. 117-cv-680, 2018 WL 1071152, at *3 (E.D. Cal. Feb. 27, 2018). In other words, "in the context of reviewing an administrative decision under the APA, there are normally no 'disputed facts that the district court must resolve.'" *Id.* (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). Rather, "[t]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co.*, 753 F.2d at 770.

**ARGUMENT**

## I. THE 2014 FINAL RULE IS NOT ARBITRARY OR CAPRICIOUS ON THE BASES ALLEGED BY PLAINTIFFS

Plaintiffs claim that the 2014 Final Rule is "arbitrary, capricious and unlawful, as applied to the AOM Programs," based on allegations that the Department failed to follow the APA's requirements for notice-and-comment rulemaking. Pl. Mem. at 9.[8] The APA's notice-and-comment rulemaking procedure typically involves three steps. *Altera Corp. & Subsidiaries v. Comm'r*, No. 16-70496, 2018 WL 3542989, at *10 (9th Cir. July 24, 2018). First, the agency must publish a general notice of proposed rulemaking in the Federal Register. *Id.* (citing 5 U.S.C. § 553(b)). Second, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* (quoting 5 U.S.C. § 553(c)). "'An agency must consider and respond to significant comments received during the period for public comment.'" *Id.* (quoting *Perez v. Mtg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015)). Third, the agency must set forth in the final rule "'a concise general statement of [its] basis and purpose.'" *Id.* (quoting 5 U.S.C. § 553(c)).

---

[8] It is unclear whether Plaintiffs' claim can properly be viewed as an as-applied challenge. Typically, an as-applied challenge would require that the plaintiff challenge the agency's application of a regulation to it through some final agency action subsequent to promulgation of the rule. *E.g.*, *Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 266 F. Supp. 2d 1101, 1120 (N.D. Cal. 2003) (suggesting a plaintiff might bring an as-applied challenge to a rule either after an enforcement proceeding or after the agency denied a petition to rescind or amend the regulation); *accord Crosby Lodge, Inc. v. Nat'l Indian Gaming Comm'n*, No. 06-cv-657, 2008 WL 5111036, at *7 (D. Nev. Dec. 3, 2008). Here, although the Department has issued notices of determination of Plaintiffs' 2015 D/E rates, Plaintiffs identify no injury resulting from those notices. Indeed, most Plaintiffs still have alternate earnings appeals pending before the Department. Moreover, Plaintiffs are not at risk of losing eligibility for Title IV funding until at least two full cycles of the D/E rate calculation process have completed. Plaintiffs' claim is better viewed as a facial challenge to the 2014 Final Rule with respect to its treatment of AOM programs.
.

Plaintiffs challenge the 2014 Final Rule only with respect to the second step of this procedure and contend that the Department's alleged failure to respond adequately to certain comments that, they claim, had particular significance to Plaintiffs renders the Rule arbitrary and capricious as applied to them. Pl. Mem. at 9. However, the Department reasonably responded on each of the points that Plaintiffs identify. Indeed, as the D.C. Circuit recognized with respect to the 2014 Final Rule, "[t]he rulemaking record repeatedly demonstrates that neither the 2014 Rule nor the Department's rulemaking process was arbitrary or capricious." *APSCU IV*, 640 Fed. App'x at 8.

As recently discussed by the Ninth Circuit, "the touchstone of arbitrary and capricious review under the APA is 'reasoned decisionmaking.'" *Altera Corp.*, 2018 WL 3542989, at *10 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *State Farm*, 463 U.S. at 43). However, "courts may not set aside agency action simply because the rulemaking process could have been improved; rather, [a court] must determine whether the agency's 'path may reasonably be discerned.'" *Id.* (quoting *State Farm*, 463 U.S. at 43).

Moreover, "[a]n agency need only respond to 'significant' comments, *i.e.*, those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule." *Id.* (quoting *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992)). Thus, the agency need not respond separately to address each specific objection made during the comment period; rather, it "need only state the main reasons for its decision and indicate that it has considered the most important objections." *Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 885 F.3d 714, 719–20 (D.C. Cir. 2018) (internal quotation omitted). To the extent comments propose alternatives, the agency "must consider only 'significant and viable' and 'obvious' alternatives." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (citing *City of Brookings Mun.*

*Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987)). "[C]omments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest require no response." *Id.* Here, although Plaintiffs mischaracterize the substance of the comments that they cite for their assertions, the Department reasonably responded to the comments that were actually submitted.

###### A.  The Department Reasonably Responded to Comments Proposing that Graduate Medical Programs Be Exempted From the GE Regulations

Throughout their summary judgment brief, Plaintiffs repeatedly assert that the Department failed to respond to comments that, in their view, "clearly demonstrate[d] that the AOM medical profession is unique." Pl. Mem. at 9 (citing Plaintiffs' Statement of Material Undisputed Facts in Support of Their Motion for Summary Judgment ("Pl. SOF") [ECF 51] ¶¶ 15–23). Plaintiffs suggest that these allegedly unique characteristics should have led the Department to establish "special provisions for AOM programs." *Id.* According to Plaintiffs, the Department not only rejected proposals made by AOM representatives, but also failed to "even acknowledge that they were considered." *Id.* at 9–10.

The Administrative Record does not support Plaintiffs' assertions. For one thing, the Administrative Record does not support the notion that commenters requested an exemption or other special provisions for AOM programs as a unique category. To the contrary, all three comment letters that Plaintiffs cite instead asserted that the GE regulations should not apply either to graduate programs in general, or to the entire category of graduate medical programs. Defendant's Controverting Statement of Facts in Opposition to Plaintiffs' Motion for Summary Judgment and Statement of Facts in Support of Defendant's Cross-Motion for Summary Judgment ("Def. SOF," filed herewith) ¶ 36. For example, the comment submitted on behalf of the Accreditation Commission for Acupuncture & Oriental Medicine (the "ACAOM letter") asserted that the GE regulations should not apply to any graduate medical programs that lead to state licensure in the healthcare professions. *Id.* The comment submitted on behalf of the Council of Colleges of

Acupuncture and Oriental Medicine (the "CCAOM letter") requested that all "Master's and above-level professional programs be exempt from the proposed debt-to-earnings ratios metrics." *Id.* The comment submitted on behalf of Phoenix Institute of Herbal Medicine & Acupuncture (the "PIHMA letter") proposed that the Department "create an exemption for graduate medical providers," identifying acupuncturists as just one example of such providers. *Id.* These were not the only comments urging that graduate programs in general, or certain categories of graduate programs, be exempted. *See* 79 Fed. Reg. at 64897 (citing comments "recommend[ing] that graduate programs be excluded" and comment seeking exemption of law programs and "similar comments with respect to graduate medical programs"); Def. SOF ¶ 37.

The Department acknowledged such comments in the 2014 Final Rule. Def. SOF ¶ 47. It responded that it lacked discretion to exempt categories of programs from the GE regulations if those categories qualify as "eligible" under Title IV. *Id.* ¶ 48. It also explained that "the issues of accountability for student outcomes, including excessive student debt, and transparency are as relevant to graduate programs and students as they are to undergraduate programs and students." *Id.* In regard to the point—made in the comments cited by Plaintiffs—that "many graduate programs prepare students for occupations where earnings gains are delayed," the Department responded that it did not view that possibility as justifying different treatment because program graduates' "earnings must be adequate to manage debt both in the early years after entering repayment and in later years." *Id.* After all, "borrowers could default on their loans soon after entering repayment, or experience extreme hardship that leads to negative consequences, well before [alleged future] earnings gains are realized." *Id.* Moreover, the assertion by commenters—including in the comments cited by Plaintiffs—that graduate programs had low default rates was "not necessarily an indication that a program is leading to manageable student debt" because "borrowers may still be facing extreme hardship in repaying their

10

loans even though they have not defaulted." *Id.*[9]

The Department's conclusions on these issues were neither arbitrary nor capricious. And the fact that the Department addressed all such comments as a group, without singling out AOM programs, is certainly not unreasonable when the comments themselves did not propose that AOM programs be treated in a special or unique manner, and when representatives of other types of programs raised similar issues.[10]

Plaintiffs in fact acknowledge that the Department addressed such comments, and they do not contend that the responses that the Department provided were unreasonable. Pl. Mem. at 12–13. Plaintiffs nevertheless insist that these responses did not respond to the comments submitted on behalf of AOM programs. *See id.* (asserting that "this general response to graduate program commenters as a group does not address the specific comments of the AOM representatives"). But this insistence is simply contrary to the record. Plaintiffs' contention that the AOM representatives requested "a special provision in the GE Regulation for AOM medical programs" is flatly contradicted by the comments

---

[9] As discussed below, the Department had separately addressed the situation of medical and dental programs whose students are required to complete an internship or residency after completion of the program based on comments received during an earlier round of rulemaking. *See* 76 Fed. Reg. 34386, 34402 (June 13, 2011) (Final regulations); NPRM, 79 Fed. Reg. at 16449. The Department rejected comments that "other types of training programs that do not require an internship or residency after program completion," such as veterinary programs, should be treated in the same way because graduates of such programs "can begin practice immediately following graduation." 79 Fed. Reg. at 64932. The Department explained that, in its view, such graduates "will have sufficient time after completion of their program to become employed and increase earnings beyond an entry level in order for the program they attended to be accurately assessed under the D/E rates measure." *Id.* In any event, none of the AOM representatives' comments referred to the Department's proposed treatment of medical and dental programs whose graduates must complete internships or residencies or suggested that AOM program graduates resembled the graduates of such programs.

[10] In a footnote, Plaintiffs attempt to distinguish *Am. Civil Liberties Union* ("*ACLU*") *v. FCC*, 823 F.2d 1554, 1581 (D.C. Cir. 1987), on the basis that the comment at issue in that case sought an exception from FCC's proposed rule for a specific cable company, "not cable operators located in remote and isolated areas in general." *See* Pl. Mem. at 12 n.7. But the comments at issue here fall on the other end of the spectrum because they not only failed to seek an exception for a specific program, but also did not request any special modification of the proposed rule for AOM programs in general. The inapplicability of *ACLU* is thus beside the point.

11

that those representatives actually submitted. *See* Def. SOF ¶ 36.

### B. The Department Reasonably Responded to Comments Proposing that Earnings Be Measured Five or More Years After Graduation

Plaintiffs also point to the AOM representatives' proposal that the Department modify its earnings measurement for the D/E rates, by measuring earnings five or more years after graduation instead of three years after graduation. Pl. Mem. at 10, 13. Again, however, the AOM representatives did not propose that the Department adopt this modification only for AOM programs, nor did they suggest that AOM program graduates were the only graduates with higher earnings later in their careers. Def. SOF ¶ 38. Commenters outside the field of acupuncture made similar assertions. *Id.* ¶ 39.

And again, the Department acknowledged and responded to the proposals that were made. *Id.* ¶¶ 49–50. In particular, the Department explained its reasons for rejecting the proposal that earnings be measured five or more years after graduation. *Id.* ¶ 50. For one thing, it explained that measuring earnings so long after graduation would lessen the value of the measurements for programs themselves or for prospective students because the data would be out-of-date by the time the D/E rates under that method were calculated. *Id.* The Department also explained that a "GE informational D/E rates data set" that had been calculated for 2012 suggested that "programs preparing students for 'less lucrative' occupations or occupations with delayed economic benefits are not problematic as a class." *Id.* It also explained again that, in its view, the D/E rate calculation should provide information about "whether a student is able to manage debt both in the early years after completion, and in later years, since students must be able to sustain loan payments at all stages, regardless of the benefits that may accrue to them over their entire career." *Id.* ¶ 53.

Other courts have recognized the Department's decision regarding the time period for measuring earnings was reasonable. *APSCU III*, 110 F. Supp. 3d at 193–94 ("'[L]ifelong' benefits, however, might not do much good when the bill collectors come calling today. And the Department realized exactly that when crafting its final rule."); *APC*, 107 F. Supp. 3d at 365–66 & n.206 (upholding the Department's decision based on the

Department's reasoning that "[m]easuring income shortly after graduation . . . provides a clearer picture of the 'current or recent performance of the program' and is a far better indicator than lifetime earnings of whether a recent graduate is capable of paying off student debt when that debt becomes due") (also citing *APSCU I*, 870 F. Supp. 2d at 152, as upholding the Department's decision for similar reasons). This Court similarly should uphold the Department's decision on this issue.

### C.    The Department Reasonably Responded to Comments Proposing Alternative Metrics

Plaintiffs similarly assert that AOM representatives proposed that AOM programs be evaluated using different metrics altogether, "such as program loan default rates, graduation (completion), professional licensure and placement rates." Pl. Mem. at 11. But the comments that were submitted again did not propose that alternative metrics be applied only to AOM programs. Def. SOF ¶¶ 40–43. The Department reasonably responded regarding the alternative metrics proposals that it received, including proposals that retention rates, employment or job placement rates, program completion or graduation rates, or licensure exam pass rates be used instead of D/E rates. *Id.* ¶ 55. In particular, the Department explained that "there is no evidence that any of these measures, by themselves, indicates whether a student will be likely to repay his or her debt." *Id.* The Department also explained that it "disagree[d] with comments suggesting [it] tailor alternative metrics to measure student outcomes in specific occupational fields" because "[i]t is neither feasible nor appropriate to apply different metrics to different kinds of programs." *Id.* Indeed, just as the earnings measurement for the D/E rate calculation is not limited to earnings in the particular field where training was received, "the occupation an individual receives training for does not by itself determine whether debt is manageable." *Id.*

In regard to default rates, the Department explained that it had "removed pCDR as an accountability metric." *Id.* ¶ 56. The Department had concluded that "further study is necessary" before the Department would adopt such a metric. *Id.* At the same time, the Department explained that the D/E rate itself was a proxy for default: "[b]ased on the best

13

data available to the Department, graduates of programs with D/E rates above the passing thresholds have higher default rates and lower repayment rates than programs below the thresholds." *Id.* Again, the Department's responses to these comments were neither arbitrary nor capricious.

### D.    Plaintiffs Fail to Identify a Viable or Obvious Alternative that the Department Ignored

In addition to their inaccurate assertions that AOM representatives proposed that AOM programs receive special treatment by being specifically exempted or by having different calculation methods or metrics applied specifically to them, Plaintiffs also seek to rely on the descriptions that the AOM representatives provided of AOM program graduates. *See* Pl. Mem. at 9. According to Plaintiffs, those descriptions "demonstrate that the AOM medical profession is unique." *Id.* at 9; *see also id.* at 11 (purporting to describe "unique factors of the AOM profession"); *id.* at 13 ("An exceptionally high percentage of self-employment is unique to the AOM medical industry . . . ."). Plaintiffs' theory is apparently that, even if the Court recognizes that no proposal specific to AOM programs was actually made, the Court should nevertheless conclude that the Department acted arbitrarily in failing to adopt a specific accommodation for AOM programs. Evidently, in Plaintiffs' view, the Department should have recognized of its own accord, based solely on the AOM representatives' submissions, that AOM programs were "unique" and were thus entitled to such an accommodation.

But the comments themselves did not refer to AOM program graduates as unique in regard to the GE regulations.[11] Again, the ACAOM letter asserted that graduates of graduate healthcare programs in general do not reach their full earnings potential until at least 5 years after graduation. Def. SOF ¶ 38. This description was not limited to AOM program graduates. The same letter suggested that the difficulty that AOM graduates might

---

[11] The ACAOM letter referred to programs in alternative healthcare as "unique educational programs," but the term "unique" there appeared to refer to the type of medicine being taught rather than the earnings or debt situation of AOM program graduates. *See* AR-H-051653.

14

face "getting started in their practices" was shared by "other developing medical professions" such as chiropractors. *Id.* While the CCAOM letter stated that AOM program graduates "primarily enter private practice" and that it "may take 3-5 years to measure" their "income potential," it did not suggest that those characteristics were unique to AOM program graduates. *Id.*

Plaintiffs' memorandum in support of summary judgment attempts to elaborate upon and effectively transform the comments that were actually submitted into an evidentiary record of the earnings trajectories of AOM program graduates, and the significance of their likely self-employment. Pl. Mem. at 13–20. But little to none of this material can be found in the Administrative Record before the Department at the time it issued the 2014 Final Rule. *Cf. Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) ("When a plaintiff challenges a final agency action, judicial review normally is limited to the administrative record in existence at the time of the agency's decision.") (citing *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 420). Indeed, while Plaintiffs complain that the Department did provide some accommodation for medical and dental programs in which graduates must complete residencies, Pl. Mem. at 17–18, the difference there is that those medical and dental programs had provided specific information about the impact of required internships and residencies on their graduates' earnings, and had requested accommodations specific to that issue in a prior rulemaking. *See* 76 Fed. Reg. at 34402. The Department took that information into account when it proposed the same accommodation in its Notice of Proposed Rulemaking. In contrast, AOM programs simply did not provide comparable information, nor did they make a comparable request.

To be sure, the ACAOM letter did provide specific estimates of AOM graduates' debt and earnings. It indicated that most AOM graduates "will borrow over $60,000" while 70% of graduates—regardless of how many years had passed since graduation—had an average gross income under $60,000. Def. SOF ¶ 44. While such estimates, if consistent

15

for all AOM programs, may suggest that AOM programs would be unlikely to receive passing D/E rates, such a result does not by itself suggest that the Department acted arbitrarily by failing, of its own accord, to develop and adopt a different evaluation metric specifically for AOM programs.[12] *See Nat'l Shooting Sports Found., Inc.,* 716 F.3d at 215 ("[A]n agency must consider only 'significant and viable' and 'obvious' alternatives.").

Plaintiffs appear to suggest that the information they provided made the *problem* obvious. But even if that were the case, the APA does not impose an obligation to address every problem in the absence of a proposed viable or obvious alternative, and the Department reasonably concluded that none of the alternative metrics were adequate substitutes for the D/E rate calculation. In short, Plaintiffs proposed no "viable" alternative themselves, and they have identified no "obvious" alternative that the Department failed to consider. *Cf. Nat'l Shooting Sports Found., Inc*., 716 F.3d at 216 (citing *Clark–Cowlitz Joint Operating Agency v. FERC,* 826 F.2d 1074, 1085 n. 11 (D.C. Cir. 1987) (en banc), as "finding alternative not 'obvious' when the 'alternative was not so "obvious" as to occur to [the commenter] itself"). Accordingly, the Department's failure to adopt an alternative specifically for AOM programs as part of the 2014 Final Rule was entirely reasonable. *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1229, 1233 (9th Cir. 1993) (concluding agency's reliance on data that failed to account for part-time workers was permissible, despite the

---

[12] Plaintiffs' assertion that all of them received "failing" D/E rates for 2015 also cannot be deemed a basis to hold the Department's Final Rule arbitrary. Such information was not part of the rulemaking record before the Department and therefore cannot be considered by the Court. *See Friends of the Clearwater*, 222 F.3d at 560. Moreover, any "'exceptions to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information.'" *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018) (internal quotation omitted); *see also id.* at 600–01 (("[P]ost-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision because it inevitably leads the reviewing court to substitute its judgment for that of the agency." (internal quotation omitted)).

resulting underestimation of labor costs, because it was the most reliable data available).[13] Plaintiff's APA claim thus fails as a matter of law, and the Court should enter judgment in favor of Defendant.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be denied, and Defendant's Cross-Motion for Summary Judgment should be granted.


Dated:  July 27, 2018                    Respectfully submitted,

                                         CHAD A. READLER
                                         Acting Assistant Attorney General

                                         MARCIA BERMAN
                                         Assistant Director, Federal Programs Branch

                                         */s/Kathryn L. Wyer*
                                         KATHRYN L. WYER
                                         Federal Programs Branch, Civil Division
                                         United States Department of Justice
                                         20 Massachusetts Ave., N.W., Room 7124
                                         Washington, D.C. 20530
                                         Telephone: (202) 616-8475
                                         Facsimile: (202) 616-8470
                                         Email: kathryn.wyer@usdoj.gov
                                         *Attorneys for Defendant*

---

[13] The Department did suggest that it might revisit such questions in the future by indicating that, "[a]s the regulations are implemented, we will monitor the impact of the D/E rates measure on all GE programs, including graduate medical programs." Def. SOF ¶ 45. As Plaintiffs point out, the Department has already initiated a new negotiated rulemaking process. *See* 82 Fed. Reg. 27640 (June 16, 2017) ("We intend to convene a committee to develop proposed regulations to revise the gainful employment regulations published by the Department on October 31, 2014 (79 FR 64889)."). While Plaintiffs fail to show that the 2014 Final Rule was arbitrary and capricious, it is also the case that the Department continues to consider issues regarding Title IV gainful employment requirements. The ongoing nature of the Department's evaluation is another reason to view its efforts as reasonable and to reject Plaintiffs' claim. *See Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 40–41 (D.D.C. 2017) ("[A]n agency need not address all problems at once. Instead, its rules may solve first those problems it prioritizes." (quoting *Star Wireless, LLC v. FCC*, 522 F.3d 469, 475 (D.C. Cir. 2008))).

1

2

## CERTIFICATE OF SERVICE

3        I hereby certify that on July 27, 2018, I electronically transmitted the attached

4   document to the Clerk's Office using the CM/ECF System for filing and served a copy of

5   the attached document and Notice of Electronic Filing to the following CM/ECF

6   registrants:

7

8        David N. Farren
         Jaburg & Wilk, PC
9        3200 N. Central Ave., Suite 2000
         Phoenix, AZ 85012
10       dnf@jaburgwilk.com

11

12       Ronald L. Holt
         Megan R. Banks
13       Rouse Frets Gentile & Rhodes LLC
         1100 Walnut, Suite 2900
14       Kansas City, Mo. 64106
         rholt@rousefrets.com
15       mbanks@rousefrets.com

16

17            and

18       Brett C. Randol
         5250 W. 116th Place, Suite 400
19       Leawood, KS 66211
         brandol@rousefrets.com
20

21       *Attorneys for Plaintiffs*

22                                    /s/ Kathryn L. Wyer
23                                    Civil Division, Department of Justice

24

25

26

27

28

18