CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave. N.W.
Washington, D.C. 20530
Telephone: (202) 616-8475
Facsimile:  (202) 616-8470
Email:  kathryn.wyer@usdoj.gov

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PIHMA Health & Education Network LLC, *et al.*,<br><br>               Plaintiffs,<br><br>     vs.<br><br>Betsy DeVos,<br><br>               Defendant. | NO. CV-17-00538-PHX-ROS<br><br>**DEFENDANT'S CONTROVERTING STATEMENT OF FACTS  IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF FACTS IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Civil Rule 56.1, Defendant responds to Plaintiffs' Statement of Material Undisputed Facts in Support of Their Motion for Summary Judgment [ECF 51] as follows. Following Defendant's responses, Defendant sets forth a statement of material facts in opposition to Plaintiffs' Motion and in support of Defendant's Cross-Motion for Summary Judgment.

**OBJECTIONS**

1.     Defendant objects to Plaintiffs' Statement to the extent that the statements in the paragraphs refer to, rely on, or are supported by evidence that is not in the Administrative Record. Plaintiffs assert claims under the Administrative Procedure Act

("APA"), 5 U.S.C. § 706. Accordingly, the Court's review is limited to the administrative record certified by the agency. *See* 5 U.S.C. § 706; *Concerned Citizens & Retired Miners Coal. v. United States Forest Serv.*, 279 F. Supp. 3d 898, 910 (D. Ariz. 2017) ("Review under the APA generally is restricted to the administrative record.") (citing *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001)); see also *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) ("[T]he focal point [of a court's review under the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court."). Here, the relevant administrative record is the rulemaking record that the Department of Education has certified in connection with its promulgation of gainful employment regulations ("GE regulations"), 79 Fed. Reg. 64890 (Oct. 31, 2014) (Final regulations) ("2014 Final Rule"). Defendant has filed an index of the Administrative Record and has served the entire administrative record on Plaintiffs as well as providing it to the Court. *See* ECF 46. Defendant will also file the relevant portions of the Administrative Record following the completion of summary judgment briefing. *See* Order of June 29, 2018 [ECF 53]. Any asserted facts that are not supported by citations to the Administrative Record therefore are not material to the Court's evaluation of Plaintiffs' claims. In addition, although certain facts regarding Plaintiffs may be relevant to Plaintiffs' standing, Defendant does not contest Plaintiffs' standing in these summary judgment proceedings. The Court therefore should not consider facts submitted by Plaintiffs that are not supported by citations to the Administrative Record, nor should it consider exhibits attached to Plaintiffs' Statement that are not from the Administrative Record.

2. Defendant objects to Plaintiffs' Statement to the extent that alleged facts, regardless of whether true, are not material to the resolution of Plaintiffs' Motion for Summary Judgment. *See* LRCiv 56.1(a) (requiring a statement "setting forth each material fact" and stating that it "should include only those facts that the Court needs to decide the motion"). "Material facts" are those facts which, under the governing substantive law,

"might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Evid. 401 (stating that "[e]vidence is relevant if . . . the fact is of consequence in determining the action"). Many of the purported facts in Plaintiffs' Statement have no bearing on the outcome of this suit under applicable law. Since Defendant must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), LRCiv 56.1, Defendant is not required to respond to assertions that are not material.

## **RESPONSES**

Defendant responds to the numbered paragraphs in Plaintiffs' Statement in correspondingly numbered paragraphs below:]

1. Not disputed.

2. Pursuant to Objections 1 and 2, these are not material facts and, to the extent they rely on material outside the Administrative Record, are not supported by admissible evidence.

3. Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence.

4. Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence.

5. Not disputed to the extent this paragraph relies on the Administrative Record.

6. Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence. The cited portion of the Administrative Record does not support these assertions.

7. Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence.

8. Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence, but not disputed.

9.     Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence, but not disputed.

10.    Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence.

11.    Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence. The Department's website indicates that at least four plaintiffs have abandoned their appeals. *See* https://studentaid.ed.gov/sa/about/data-center/school/ge .

12.    Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence, but not disputed.

13.    Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence, but not disputed.

14.    Not disputed.

15.    Disputed to the extent these assertions are inconsistent with the cited Administrative Record. The cited pages of the comment submitted by ACAOM did not "inform[] the Department that most AOM graduates do not have employment opportunities in hospital or clinics." See AR-H-051647 to AR-H-051648. In addition, the remainder of that comment does not convey that information. Rather, it contains a vague statement that "[e]mployment by traditional hospitals and clinics is still developing and may also only be part-time until the practice fully develops." AR-H-051652.

16.    Not disputed.

17.    Not disputed.

18.    Not disputed.

19.    Disputed. In ACAOM's description, the NCCAOM survey indicated that 70% of all AOM graduates had an average gross income under $60,000 while 80% of AOM graduates who received their certification in the last five years had an average gross income under $60,000. AR-H-051652.

20. Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence. The ACAOM comment letter did not include the assertions contained in this paragraph, nor did it attach the NCCAOM report of survey results, nor did it provide a citation or link to the NCCAOM report. Nor is this report elsewhere in the Administrative Record. Any information that might be in the NCCAOM report but is not included in the ACAOM comment letter therefore is outside the Administrative Record and is not admissible.

21. Disputed to the extent this description is inconsistent with the cited portions of the Administrative Record. The CCAOM comment letter stated that acupuncture graduates "primarily enter private practice" and that their "income potential may take 3-5 years to measure adequately," with no further information. AR-H-100352. The letter also stated that the proposed GE regulations "[d]o not take into account the choice of graduates to work less than full-time," but made no assertion regarding the extent to which AOM graduates might work less than full-time. *Id.* The letter asserted that AOM graduates "have a historically low default rate" but provided no specific data on that point. AR-H-100353.

22. Disputed to the extent this description is inconsistent with the cited portions of the Administrative Record. The CCAOM comment letter indicated that CCAOM "favors alternative metrics such as default rates, board scores, and graduation rates." AR-H-100353. The CCAOM letter did not mention "accreditation status" as an alternative metric. *See id.*

23. Disputed to the extent this description is inconsistent with the cited portions of the Administrative Record. The comment letter submitted by Ms. Niemiec stated that "the 3-year limit for the ratio is too short for these highly-trained graduate medical providers to reach the gainful employment numbers that are proportionate for the amount borrowed. In almost all cases, it takes at least 5 years to reach the level of performance of this primary care provider in the marketplace." AR-H-101572. The letter provided no further information related to that point. Ms. Niemiec's comment recommended alternate

measures of performance, but her recommendation was not limited to AOM programs; rather, she recommended that the alternate measures be adopted for all programs. *See id.*

24. Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence.

25. Not disputed.

26. Not disputed.

27. Disputed. The Department reasonably responded to the comments that were submitted. 79 Fed. Reg. 64890 (Oct. 31, 2014) (Final regulations ("2014 Final Rule")). In particular, the Department responded to comments proposing that certain categories of programs, such as all graduate programs or all graduate medical programs, be exempted from the GE regulations, and explained why the Department rejected those proposals. *Id.* at 64897-64898. The Department also responded to comments that the D/E rate calculation measure earnings from a later period after graduation, such as five years after graduation, and explained why the Department rejected those proposals. *Id.* at 64931; *see also id.* at 64914. The Department also responded to comments proposing alternative metrics, instead of the D/E rate, and explained why the Department rejected those proposals. *Id.* at 64915, 64916.

28. Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence.

29. Pursuant to Objections 1 and 2, these are not material facts and are not supported by admissible evidence.

30. Not material, but not disputed.

31. Not material, but not disputed.

32. Not material, and disputed. The Department has extended the deadline to provide warnings

33. Not material, and disputed to the extent this description is inconsistent with the cited portions of the Administrative Record. The quoted portions of the Administrative

1  Record do not support Plaintiffs' statement that the Department considers it "likely" that
2  the warnings will cause students to withdraw or not enroll. *See* 79 Fed. Reg. at 64970,
3  65078.

### DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

34.   The Department issued a Notice of Proposed Rulemaking ("NPRM") regarding the proposed GE regulations on March 25, 2014. 79 Fed. Reg. 16426-01 (Mar. 25, 2014). In response to that NPRM, the Department received approximately 95,000 comments spanning hundreds of thousands of pages. 79 Fed. Reg. 64890-01, 64892 (Oct. 31, 2014) (Final regulation); *see* Administrative Record (DVD) (folder H – Public Comments Received on Notice of Negotiated Rulemaking). The Department issued a final rule responding to comments and promulgating final regulations on October 31, 2014. 79 Fed. Reg. 64890 ("2014 Final Rule").

35.   In their summary judgment filing, Plaintiffs identify three comment letters that were submitted during this process as submitted by "[Acupuncture and Oriental Medicine ("AOM") program] representatives," Pl. Mem. at 10: (1) the May 23, 2014 letter signed by Catherine Niemiec and Mark S. McKenzie on behalf of the Accreditation Commission for Acupuncture & Oriental Medicine" (the "ACAOM letter"), AR-H-051647 to AR-H-051653; (2) the May 12, 2014 letter signed by Lixin Huang on behalf of the Council of Colleges of Acupuncture and Oriental Medicine (the "CCAOM letter"), AR-H-100352 to AR-H-100353; and (3) the May 21, 2014 letter signed by Catherine Niemiec on behalf of Phoenix Institute of Herbal Medicine & Acupuncture (the "PIHMA letter"), AR-

H-101572 to AR-H-101573. Pl. Mem. at 10-12; Pl. Statement of Material Undisputed Facts ("Pl. SMF") ¶¶ 15-23.

36. None of the three comment letters requested an exemption from the GE regulations for AOM programs specifically. ACAOM letter, AR-H-051647 to AR-H-051653; CCAOM letter, AR-H-100352 to AR-H-100353; PIHMA letter, AR-H-101572 to AR-H-101573. The ACAOM letter asserted that the GE regulations should not apply to any graduate medical programs that lead to state licensure in the healthcare professions. ACAOM letter, AR-H-051647. The CCAOM letter requested that all "Master's and above-level professional programs be exempt from the proposed debt-to-earnings ratios metrics." CCAOM letter, AR-H-100353. The PIHMA letter proposed that the Department "create an exemption for graduate medical providers such as Acupuncturists." PIHMA letter, AR-H-101572.

37. Other commenters also proposed exemptions for graduate medical programs. *See, e.g.*, AR-H-087918 (comment of American Association of Colleges of Osteopathic Medicine ("AACOM")) ("AACOM asks the Department to exempt all U.S. graduate terminal degree medical education programs from these regulations."). Other commenters also proposed that the GE regulations should exclude all graduate programs, regardless of subject area. *See, e.g.*, AR-H-062522 (comment of Laureate Education, Inc.) (proposing that graduate-level programs be excluded from the GE regulations' "[D/E] metrics and certification requirements"); AR-H-088556 (comment of American Public University

System) (suggesting that Congress did not intend the reference to gainful employment in Title IV to apply to graduate programs).

38. None of the three comment letters suggested that AOM program graduates were unique in having higher earnings five or more years after graduation. The ACAOM letter indicated, in connection with its proposal that graduate medical programs as a category be exempted from the GE regulations, that "[i]mplementing the 3-year rule instead of a more realistic 5 or 7 year time period for the debt ratios fails to consider the time necessary to build a professional healthcare practice in the rapidly changing healthcare marketplace." ACAOM letter, AR-H-051647; *see also id.* AR-H-051650 (asserting that students in "longer term and costlier healthcare programs" do not achieve "higher rates of income" for "at least 5 years"). The ACAOM letter also indicated that "many graduates have initial difficulty getting started in their practices," and that "this is often the case as well with other developing medical professions" including osteopaths, naturopaths, and chiropractors. *Id.* AR-H-051652. The CCAOM letter asserted that AOM program graduates "primarily enter private practice" and that the "income potential" for such graduates "may take 3-5 years to measure adequately," but did not state that these characteristic were unique to AOM program graduates. CCAOM letter, AR-H-100352. The PIHMA letter asserted that "it takes at least 5 years" for "these highly-trained graduate medical providers" "to reach the level of performance of this primary care provider in the marketplace." PIHMA letter, AR-H-101572. To the extent this assertion is

comprehensible, the letter did not state that this characteristic was unique to AOM program graduates.

39. Other commenters suggested that graduates of other programs might also take five years or more to establish their practice or realize a stable level of earnings. *See, e.g.*, AR-H-088557 (comment of American Public University System) ("degrees such as Entrepreneurship or Computer Programming that cater to individuals willing to start a business and forego income in the early years will likely be affected as well."); AR-H-100065 (comment by Apollo Education Services employee) ("You can see a pattern here—none of the degree programs are in fields which offer a high starting salary upon graduation. . . . it is a disconnect to judge the quality of a degree program based upon early career salary."); AR-H-100378 (comment of Executive Director, Orleans Technical Institute) ("Graduate surveys indicate that recent grads use the first five years to gain experience, change jobs and decide what part of a career they want their specialty to be. They may also stop-out during that crucial third year to start a family.")

40. None of the three comment letters suggested that the Department should adopt alternative metrics for determining whether program graduates were able to repay their loans that would be available only to AOM programs, nor did they explain why their proposed metrics would be uniquely appropriate for AOM programs. ACAOM letter, AR-H-051647 to AR-H-051648; CCAOM letter, AR-H-100353; PIHMA letter, AR-H-101572.

41. The ACAOM letter proposed alternative metrics that would either be generally applicable or apply to all graduates of medical programs that lead to state

licensure in the healthcare professions. ACAOM letter, AR-H-051648. In particular, it proposed that that alternative metrics such as default rates, graduation rates and board examination scores be used to demonstrate gainful employment potential for graduates of medical programs, including [AOM], that lead to state licensure in the healthcare professions." *Id.*

42. The CCAOM letter stated that CCAOM generally "favor[ed] alternative metrics such as default rates, board scores, and graduation rates," with no further explanation of how it proposed those metrics would be used. CCAOM letter, AR-H-100353.

43. The PIHMA letter stated that "it takes at least 5 years to reach the level of performance of this primary care provider in the marketplace" and that "[a] 5-year scale is more realistic," but did not provide any explanation for this assertion. PIHMA letter, AR-H-101572. The PIHMA letter also "recommend[ed] using alternate measures of performance . . . such as default rates, board examination scores, and graduation rates," with no further explanation of how it proposed those metrics would be used. PIHMA letter, AR-H-101572.

44. The ACAOM letter cited a 2008 survey indicating that AOM graduates spent an average of $55,984 to $100,000 for their student loans, and that the average debt load was $45,891. ACAOM letter, AR-H-051652. The survey also indicated that 80% of graduates earned less than $60,000 during their first five years in practice, and that 70% of all graduates had an average gross income less than $60,000. *Id.* At the same time, the

ACAOM letter suggested that most AOM students "will borrow over $60,000." *Id.* AR-H-051651. The ACAOM letter did not attach or cite the report containing survey results or provide a link to the report. *Id.* AR-H-051652. The report is not in the Administrative Record.

45. The CCAOM letter asserted that AOM graduates "primarily enter private practice" and that their "income potential may take 3-5 years to measure adequately," but did not provide any further detail or support for these assertions. CCAOM letter, AR-H-100352. The CCAOM letter also asserted that some graduates chose "to work less than full-time or in lower income settings as a public service," but did not indicate that these characteristics were unique to AOM program graduates or those who graduated less than 3 years previously. *Id.*

46. The Department responded to the points raised in these three letters in its Final Rule promulgating the GE regulations. 2014 Final Rule, 79 Fed. Reg. 64890.

47. The Department acknowledged comments recommending that certain categories of programs, such as all graduate programs, be excluded from the GE regulations. *See id.* at 64897 ("Commenters recommended that graduate programs be excluded from the definition and, specifically, from evaluation under the accountability metrics."). It also acknowledged comments proposing that "all law programs" be exempt from the GE regulations because "students who complete accredited law programs rarely have difficulty in avoiding default on loans," and "similar comments with respect to

graduate medical programs," and that the Department "conduct a study on the impact of the D/E rates measure on medical programs and release that with the final regulations." *Id.*

48. The Department responded to these comments at length, stating in part:

> To the extent a program constitutes an "eligible program" that "provides a program of training to prepare students for gainful employment in a recognized profession" under the HEA, the program by statute constitutes a "GE program," and we do not have the authority to exclude it from the regulations. We note, for example, that Congress amended the HEA in 2008 to exempt from the gainful employment provisions programs leading to a baccalaureate degree in liberal arts that had been offered by a regionally accredited proprietary institution since January 1, 2009. We view this relatively recent and very specific amendment as an indication that the Department lacks discretion to exempt other types of programs. This applies to graduate programs, including ABA-accredited law schools or medical schools, regardless of the results of such programs under the D/E rates measure. The Department is not providing a separate study analyzing the impact of the D/E rates measure on medical programs with these regulations. As the regulations are implemented, we will monitor the impact of the D/E rates measure on all GE programs, including graduate medical programs.
>
> We also do not agree that the purposes of the regulations are served by excluding graduate programs. Specifically, the issues of accountability for student outcomes, including excessive student debt, and transparency are as relevant to graduate programs and students as they are to undergraduate programs and students. Whether or not it is the case that many graduate programs prepare students for occupations where earnings gains are delayed, we do not believe that this justifies an exemption from the regulations. As discussed in the NPRM, earnings must be adequate to manage debt both in the early years after entering repayment and in later years. Future earnings gains are of course a desirable outcome, but borrowers could default on their loans soon after entering repayment, or experience extreme hardship that leads to negative consequences, well before these earnings gains are realized. Further, as discussed in the NPRM, borrowers may still be facing extreme hardship in repaying their loans even though they have not defaulted, and so, a low default rate by itself is not necessarily an indication that a program is leading to manageable student debt.

*Id.* at 64897-64898.

49. The Department acknowledged comments that "evaluating earnings after three years is arbitrary, will lead to underestimating how much borrowing is reasonable for education, and will not adequately account for the long-term benefits of completing a program," and that "evaluating programs using graduates' earnings three years after graduation will cause institutions to stop offering programs with long-term salary growth potential but with low starting salaries." *Id.* at 64930. The Department indicated that commenters had recommended that the regulations be modified to evaluate programs "based on graduates' earnings at a later time in their careers," and that the recommendations "var[ied] from three to 10 years after completion." *Id.* at 64931.

50. The Department responded to those comments at length, stating in part:

> We believe that measuring earnings for the employment range covered by the two-year cohort period strikes the appropriate balance between providing ample time for students to become employed and increase earnings past entry level and yet not letting so much time pass that the D/E rates are no longer reflective of the current or recent performance of the program.
>
> The D/E rates measure primarily assesses whether the loan debt incurred by students actually "pay[s] dividends in terms of benefits accruing from the training students received," and whether such training has indeed equipped students to earn enough to repay their loans such that they are not unduly burdened. H.R. Rep. No. 89-308, at 4 (1965); S. Rep. No. 89-758, at 7 (1965). As discussed in "§ 668.403 Gainful Employment Program Framework," high D/E rates indicate that the earnings of a program's graduates are insufficient to allow them to manage their debt. The longer the Department waits to assess the ability of a cohort of students to repay their loans, the less relevant that assessment becomes for prospective students, and the more likely it is that new students will attend a program that is later determined to be ineffective at preparing students for gainful employment. Assessing the outcomes of less recent graduates would also make it more difficult for institutions to improve student and program outcomes under the D/E rates measure as it would take many years before subsequently enrolled students who complete the program would be included in the D/E rates calculation.

> There is no evidence that relying on earnings during the employment range used in the regulations would actually create the disincentives or result in the harms that commenters suggest. Specifically, many programs training future nurses, teachers, and other modest-earning professions, as characterized by the commenters, would successfully pass the D/E rates measure. For example, of the 497 licensed practical/vocational nurse training programs in the 2012 GE informational D/E rates data set, 493 (99 percent) passed, 4 (1 percent) fell in the zone, and none of the programs failed. In addition, of the 113 programs categorized as education programs by the two-digit CIP code, 109 (96 percent) passed, 3 (3 percent) were in the zone, and only 1 (1 percent) failed. This suggests that programs preparing students for "less lucrative" occupations or occupations with delayed economic benefits are not problematic as a class—many programs in these categories succeed in ensuring that the debt of their students is proportional to earnings.

*Id.* (footnote omitted).

51. The Department also emphasized elsewhere in the Final Rule that:

Repayment under the standard repayment plan is typically expected to be completed within 10 years; the return on investment from training may well be experienced over a lifetime, but benefits ultimately available over a lifetime may not accrue soon enough to enable the individual to repay the student loan debt under and within the schedules available under the title IV, HEA programs. . . . [W]e believe it is important to measure whether the ratio of debt to earnings indicates whether a student is able to manage debt both in the early years after completion, and in later years, since students must be able to sustain loan payments at all stages, regardless of the benefits that may accrue to them over their entire career.

*Id.* at 64914.

52. The Department also acknowledged comments proposing that it use different metrics for short-term certificate programs, on the one hand, and graduate programs, on the other hand, because "graduate programs may produce larger debt levels, but have larger increases in lifetime earnings." *Id.* at 64916.

53. The Department responded to those comments by stating:

15

> We believe that the D/E rates measure is an appropriate metric to assess all GE programs, including graduate professional programs. These regulations will help ensure that students who attend GE programs are able to manage their debt. Although graduates of professional programs may experience increased earnings later, as discussed previously, earnings must be adequate to manage debt both in the early years after entering repayment and in later years, regardless of what an individual's lifetime earnings may be.
>
> Further, as discussed later in this section, the discretionary income rate will help accurately assess programs that may result in higher debt that may take longer to repay but also provide relatively higher earnings.

*Id.*

54. The Department also acknowledged comments proposing that alternative metrics be used. Specifically, the Department identified comments that the Department use metrics "more closely linked to student academic achievement, loan repayment behavior, or employment outcomes like job placement rates," or metrics "tailored to measure student outcomes in specific occupational fields," such as "licensure exam pass rates and residency placement rates." *Id.* at 64912. The Department acknowledged other comments suggesting that the Department consider "retention and graduation rates as alternative metrics, as completion of a degree or certificate program is closely linked to whether students obtain employment." *Id.*

55. The Department responded to these comments at length, stating in part:

> We appreciate the suggestions to use retention rates, employment or job placement rates, and completion rates as alternative measures to the D/E rates measure. While these are all valid and useful indicators for specific purposes, there is no evidence that any of these measures, by themselves, indicates whether a student will be likely to repay his or her debt. For example, placing a student in a job related to the training provided by a program is a good outcome, but without considering any information related to the student's debt or earnings, it is difficult to say whether the student will be able to make

16

monthly loan payments. We also disagree that the D/E rates measure is tenuously linked to the performance of programs because it does not take into account these alternative metrics. We believe the measure appropriately holds programs accountable for whether students earn enough income to manage their debt after completion of the program.

We do not agree that, without a graduation rate metric, poorly performing programs will not be held accountable under the regulations due to having an insufficient number of students who complete the programs to be evaluated under the D/E rates measure. First, in order to address this concern, we calculate the D/E rates measure over a four-year cohort period for small programs in order to make it more likely that programs with low graduation rates are evaluated. Second, although the regulations do not include pCDR as an accountability metric, they will require programs to disclose completion rates and pCDR to students and we believe these disclosure items will help students and families make more informed enrollment decisions. Third, as previously stated, the focus of the D/E rates measure is to hold programs accountable for whether students are able to manage their debt after completion, and we do not believe it is appropriate to base eligibility for title IV, HEA program funding on a metric, such as graduation rate, that does not indicate whether a student will be likely to repay his or her debt.

We disagree with comments suggesting we tailor alternative metrics to measure student outcomes in specific occupational fields, such as cosmetology or medical professions. It is neither feasible nor appropriate to apply different metrics to different kinds of programs. By itself, the occupation an individual receives training for does not by itself determine whether debt is manageable. Rather, it is related to the debt that the individual accumulates and the earnings achieved as a result of the program's preparation—exactly what the D/E rates measure assesses.

Similarly, we believe it is inappropriate to rely on licensure exam pass rates and residency placement rates to evaluate medical programs and other graduate programs. There is no evidence that any of these measures, by themselves, would indicate whether a student will be likely to be able to repay his or her debt.

*Id.* at 64915.

56.     In addition, in regard to the possibility of using a default rate as an accountability measure, the Department indicated that it had "removed pCDR as an

accountability metric." *Id.* at 64916. It also explained:

> Given the wealth of feedback we received on this issue through the comments, we believe further study is necessary before we adopt pCDR or another accountability metric that would take into account the outcomes of students who do not complete a program. We also believe further study is necessary before adopting other metrics based on CDR, including "borrowing indices" that take into account iCDR and the percentage of students who take out loans at the institution. Using the information we will receive from institutions through reporting, we will continue to develop a robust measure of outcomes for students who do not complete a program, which may include some measure based on repayment behavior. Because pCDR has been removed as an accountability metric, we do not specifically address the comments related to its operation for accountability purposes.

*Id.* At the same time, the Department explained that, "[b]ased on the best data available to the Department, graduates of programs with D/E rates above the passing thresholds have higher default rates and lower repayment rates than programs below the thresholds." Id. at 64914.

Dated: July 27, 2018
Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

/s/Kathryn L. Wyer
KATHRYN L. WYER
Federal Programs Branch, Civil Division
United States Department of Justice
20 Massachusetts Ave., N.W., Room 7124
Washington, D.C. 20530
Telephone: (202) 616-8475
Facsimile: (202) 616-8470
Email: kathryn.wyer@usdoj.gov
*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and served a copy of the attached document and Notice of Electronic Filing to the following CM/ECF registrants:

David N. Farren
Jaburg & Wilk, PC
3200 N. Central Ave., Suite 2000
Phoenix, AZ 85012
dnf@jaburgwilk.com

Ronald L. Holt
Megan R. Banks
Rouse Frets Gentile & Rhodes LLC
1100 Walnut, Suite 2900
Kansas City, Mo. 64106
rholt@rousefrets.com
mbanks@rousefrets.com

    and

Brett C. Randol
5250 W. 116th Place, Suite 400
Leawood, KS 66211
brandol@rousefrets.com

*Attorneys for Plaintiffs*

                                 */s/ Kathryn L. Wyer*
                                 Civil Division, Department of Justice